UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED
SEP 23 2015
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:15CR436 JAR/TCM |
| ROMAN LUBAVIN, also known as ROMAN LUBAVYN, also known as ROMAN LIOUBAVINE, also known as ROMAN LYUBAVIN, | ) ) ) ) ) ) |
| Defendant. | ) ) |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

1. At all times relevant to this Indictment, Aristocrat Technology, Inc. ("Aristocrat") was a corporation registered to do business in the United States, with offices in Las Vegas, Nevada and elsewhere.

2. Aristocrat at one time manufactured an electronic slot machine game system known as the Mark VI Electronic Gaming Device ("Mark VI Device"). All Mark VI Devices had uniform hardware and internal ("back-end") gaming software, but they featured a variety of visual interfaces. For example, different Mark VI Devices had visual interfaces including "50 Lions," "100 Lions," "Star Drifter," "Heart of Gold," "Miss Kitty," and "Pelican Pete."

3. Mark VI Devices were programmed so that, assuming fair play by the user of the devices, the Mark VI Devices would pay out at a known rate less than 100%. Although it would be

1

atypical for any particular Mark VI Device to show a positive "win" total on a particular date, such events would sometimes be explained by the device's paying the occasional jackpot.

4. At all times relevant to this Indictment, Mark VI Devices were in operation at casinos in numerous U.S. states, including Missouri, California, and Illinois.

5. At all times relevant to this Indictment, the following were casinos located in and operating in the following locations within the United States:

| Name | Location |
|---|---|
| Pechanga Resort and Casino | Temecula, California |
| Casino Queen | East St. Louis, Illinois |
| Ameristar Casino | Kansas City, Missouri |
| Harrah's Casino | Kansas City, Missouri |
| Isle of Capri Casino | Kansas City, Missouri |
| Argosy Casino | Riverside, Missouri |
| Ameristar Casino | St. Charles, Missouri |
| Hollywood Casino | St. Louis, Missouri |
| Lumiere Casino | St. Louis, Missouri |
| River City Casino | St. Louis, Missouri |

6. At all times relevant to this Indictment, Ameristar Casino – St. Charles, Hollywood Casino, River City Casino, and Lumiere Casino were casinos within the Eastern District of Missouri.

## LEGAL BACKGROUND

7. At all times relevant to this Indictment, the State of Missouri had criminal laws which prohibited cheating in connection with gambling in casinos. These laws included, but were not limited to, the following:

    a. Missouri Revised Statute § 313.830.4(3), which makes it a crime to use a device to project the outcome, keep track of cards, or analyze the occurrence of the probability of an event in a gambling game;

    b.    Missouri Revised Statute § 313.830.4(6), which makes it a crime to instruct another in cheating at a gambling game or in the use of a device for cheating at a gambling game;

    c.    Missouri Revised Statute § 313.830.4(8), which makes it a crime to place a bet in a gambling game using information not available to other players; and

    d.    Missouri Revised Statute § 313.830.4(13), which makes it a crime to possess a device used to aid in cheating at a gambling game.

8. At all times relevant to this Indictment, the State of California had criminal laws which prohibited cheating in connection with gambling in casinos. These laws included, but were not limited to, the following:

    a.    California Penal Code § 337v, which makes it a crime for any person at a gambling establishment to use, or to possess with the intent to use, a device to assist in projecting the outcome of the gambling game, analyzing the probability of the occurrence of an event relating to a gambling game, or analyzing the strategy for playing or wagering to be used in the gambling game except as permitted by the California Gambling Control Commission or a tribal gaming agency; and

    b.    California Penal Code § 337x, which makes it a crime to cheat at any gambling game in a gaming establishment.

9. At all times relevant to this Indictment, the State of Illinois had criminal laws which prohibited cheating in connection with gambling in casinos. These laws included, but were not limited to, the following:

    a.    Chapter 230, Illinois Compiled Statutes 10/18(d)(3), which makes it a crime to use or possess with intent to use a device to assist in projecting the outcome of a game or in analyzing the probability of an event relating to a gambling game;

    b.    Chapter 230, Illinois Compiled Statutes 10/18(d)(4), which makes it a crime to cheat at a gambling game; and

    c.    Chapter 230, Illinois Compiled Statutes 10/18(d)(7), which makes it a crime to place a bet after acquiring knowledge, not available to all players, of the outcome of a gambling game which is subject to the bet or to aid a person in acquiring the knowledge for the purpose of placing a bet contingent on that outcome.

## COUNT I
### (Conspiracy to Violate Title 18, United States Code, Section 1952)

10. Beginning at a time unknown to the Grand Jury but at least as early as May 17, 2014, and continuing through at least December 8, 2014, within the Eastern District of Missouri and elsewhere, the Defendant

**ROMAN LUBAVIN, also known as
ROMAN LUBAVYN, also known as
ROMAN LIOUBAVINE, also known as
ROMAN LYUBAVIN,**

and others known and unknown to the Grand Jury (together, the "Co-Conspirators"), did knowingly conspire to commit certain offenses against the United States, to wit:

a. to travel in interstate and foreign commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, a business enterprise involving gambling in violation of the laws of the states of California, Missouri, and Illinois, as set forth herein in paragraphs 7 through 9 above, and to thereafter perform and attempt to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said business, in violation of Title 18, United States Code, Section 1952(a)(3) and (a)(3)(A);

b. to engage in financial transactions involving the proceeds of the aforementioned violations of Title 18, United States Code, Section 1952(a)(3) and (a)(3)(A), knowing that the property involved in said offenses was the proceeds of some form of unlawful activity, knowing that the transactions were designed, at least in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of said proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

c. to engage and attempt to engage in monetary transactions in property, derived from the aforementioned violations of Title 18, United States Code, Section 1952(a)(3) and (a)(3)(A), of a value greater than $10,000.00, knowing that the transactions involved criminally derived property, in violation of 18 U.S.C. § 1957(a).

In violation of Title 18, United States Code, Section 371.

### MANNER AND MEANS OF THE CONSPIRACY

11. The manner and means of the scheme and conspiracy are further described as follows:

4

 a. It was part of the conspiracy that the Defendant's co-conspirators would each fly into the United States from abroad via commercial air carriers.

 b. It was further part of the conspiracy that the Defendant's co-conspirators, once they had arrived in the United States, would rent hotel and motel rooms.

 c. It was further part of the conspiracy that the Defendant's co-conspirators would rent motor vehicles from commercial car rental companies for the purpose of traveling between and among the United States.

 d. It was further part of the conspiracy that the Defendant's co-conspirators would transport one another to various casinos using one or more of the rented vehicles.

 e. It was further part of the conspiracy that the Defendant's co-conspirators would enter into any one of the casinos. Once in the casino, the Defendant's co-conspirators would locate one or more Mark VI Devices within the casino.

 f. Once seated in front of any such Mark VI Device, the Defendant's co-conspirators would utilize an electronic device, including but not limited to an iPhone 5 and an iPhone 5s, in order to assist them in predicting the behavior and operation of the Mark VI Device. Specifically, the devices employed by the Defendant's co-conspirators contained software which the Defendant's co-conspirators used to communicate with a server located abroad, which server transmitted information to the Defendant's co-conspirators about the predicted behavior and operation of the game.

 g. It was further part of the conspiracy that the Defendant's co-conspirators used this information to generate uncharacteristically large payouts from the Mark VI Devices in the form

5

of Ticket In/Ticket Out vouchers ("TITO Vouchers"). The results achieved by the co-conspirators were far higher than would be expected from fair play.

h. It was further part of the conspiracy that the Defendant's co-conspirators cashed in the TITO Vouchers for U.S. Currency.

i. It was further part of the conspiracy that the Defendant's co-conspirators would ordinarily operate multiple Mark VI Devices within the same casino in the manner described above.

j. It was further part of the conspiracy that the Defendant's co-conspirators would travel within, between, and among the United States over the course of multiple days or weeks at a time in order to perform the same and similar activities as described above at additional casinos.

k. It was further part of the conspiracy that the Defendant's co-conspirators would fly out of the United States via commercial air carriers, ultimately returning to Russia.

l. It was further part of the conspiracy that one of Defendant's co-conspirators would convey the proceeds of the activities of the conspiracy, still in the form of U.S. currency, to LUBAVIN via hand delivery to his apartment.

m. It was further part of the conspiracy that LUBAVIN would conceal the proceeds of the activities of conspiracy within his apartment.

n. It was further part of the conspiracy that LUBAVIN would cause the proceeds of the activities of conspiracy to be conveyed to other members of the conspiracy.

## OVERT ACTS

12. In furtherance of the conspiracy, and to accomplish the objectives of the conspiracy, the Co-Conspirators committed, among others, the following acts within the Eastern District of Missouri and elsewhere:

   a. On or about May 17, 2014, one of Defendant's co-conspirators traveled from Moscow, Russia to Los Angeles, California.

   b. Between May 17, 2014 and May 26, 2014, one of Defendant's co-conspirators traveled from Los Angeles, California to Kansas City, Missouri.

   c. On or about June 1, 2014, at about 11:42 a.m., one of Defendant's co-conspirators entered River City Casino in St. Louis, Missouri.

   d. Also on or about June 1, 2014, one of Defendant's co-conspirators operated a Mark VI Device within River City Casino.

   e. Also on or about June 1, 2014, one of Defendant's co-conspirators cashed out approximately $10,568.00 in TITO Vouchers for U.S. currency at River City Casino.

   f. On or about June 2, 2014, at about 9:42 a.m., one of Defendant's co-conspirators entered Lumiere Place Casino in St. Louis, Missouri.

   g. Also on or about June 2, 2014, one of Defendant's co-conspirators operated a Mark VI Device within Lumiere Place Casino.

   h. Also on or about June 2, 2014, one of Defendant's co-conspirators cashed out approximately $9,909.00 in TITO Vouchers for U.S. currency at Lumiere Place Casino.

   i. On or about June 3, 2014, at about 11:27 a.m., one of Defendant's co-conspirators entered Lumiere Place Casino in St. Louis, Missouri.

7

j. Also on or about June 3, 2014, one of Defendant's co-conspirators operated a Mark VI Device within Lumiere Place Casino.

k. Also on or about June 3, 2014, one of Defendant's co-conspirators cashed out approximately $11,196 in TITO Vouchers for U.S. currency at Lumiere Place Casino.

l. On or about June 6, 2014, one of Defendant's co-conspirators traveled from New York City, New York to Moscow, Russia.

m. On or about July 13, 2014, one of Defendant's co-conspirators traveled from Moscow, Russia to Los Angeles, California.

n. On or about November 15, 2014, one of Defendant's co-conspirators traveled from Moscow, Russia to Miami, Florida.

o. On or about November 18, 2014, two of Defendant's co-conspirators traveled from Moscow, Russia to Miami, Florida.

p. On or about December 3, 2014, one of Defendant's co-conspirators traveled from Moscow, Russia to Chicago, Illinois.

q. Between December 3, 2014 and December 6, 2014, three of Defendant's co-conspirators traveled from Chicago, Illinois to St. Charles, Missouri.

r. On or about December 5, 2014, at about 2:59 p.m., two of Defendant's co-conspirators entered the Hollywood Casino in St. Louis, Missouri.

s. Also on or about December 5, 2014, one of Defendant's co-conspirators operated a Mark VI Device within Hollywood Casino.

t. Also on December 5, 2014, one of Defendant's co-conspirators operated a Mark VI Device within Hollywood Casino.

8

u. On December 6, 2014, one of Defendant's co-conspirators rented a 2013 Chevrolet Equinox from Hertz at Lambert International Airport in St. Louis, Missouri.

v. Between December 6, 2014 and December 7, 2014, two of Defendant's co-conspirators traveled from St. Louis, Missouri to East St. Louis, Illinois.

w. On December 7, 2014, two of Defendant's co-conspirators entered the Casino Queen in East St. Louis, Illinois.

x. Also on December 7, 2014, one of Defendant's co-conspirators operated a Mark VI Device within the Casino Queen.

y. Also on December 7, 2014, another of Defendant's co-conspirators operated a Mark VI Device within the Casino Queen.

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATION

13. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Sections 371 and 1952(a)(3) as set forth in Count I, the Defendant shall forfeit to the United States of America any property, real or personal, constituting or derived from any proceeds traceable to said offense.

14. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

15. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

                                                            A TRUE BILL.

                                                            FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney